ATCHISON, TOPEKA & SANTA FE
RAILWAY CO., et al., Plaintiffs,

v.

Arthur E. SUMMERFIELD, Postmaster
General, Defendant.

Civ. A. No. 4958-54.

United States District Court,
District of Columbia.

Jan. 28, 1955.

Francis M. Shea, Washington, D. C. (J. Carter Fort, Gregory S. Prince, Philip F. Welsh, Lawrence J. Latto, Alfred L. Scanlan, Washington, D. C., Starr Thomas, Chicago, Ill., T. J. Slattery, Earl F. Requa, St. Paul, Minn., Robert J. McLean, New York City, and F. J. Melia, Omaha, Neb., on the brief), for plaintiffs.

Edward H. Hickey, Washington, D. C. (Warren E. Burger, Asst. Atty. Gen., Leo A. Rover, U. S. Atty., Oliver Gasch, Abe McGregor Goff, Solicitor, Frederick E. Batrus, Associate Solicitor, Paul Meininger, F. Carolyn Graglia, Charles N. Gregg, Jr., Stephen W. Terry, Jr., Washington, D. C., on the brief), for defendant.

KIRKLAND, District Judge.

In the case of the Atchison, Topeka and Santa Fe Railway Company, Great Northern Railway Company, Northern Pacific Railway Company, Southern Pacific Company, Union Pacific Railroad Company, plaintiffs, versus Arthur E. Summerfield as the Postmaster General, defendant, in Civil Action No. 4958–54, extremely capable and excellent lawyers on both sides of the trial table, fully prepared and with very substantial, well-documented points and authorities and briefs in support of their position have argued very ably and in the finest traditions of the legal profession for their particular adversary positions.

Generally a court will immediately go into the question of jurisdiction and venue since it is essential to any determination, but in this particular case the Court will, in order that the record shall run chronologically, begin by referring to the pleadings which constitute the issues.

There was filed at the outset on November 20, 1954, a complaint by the plaintiffs who are the five major railroad trunk lines running westward from the Middle West to the extreme Far West to the continental limits of the United States, and they are in the main the five trunk lines that furnish the bulk of the service as far as rail service is concerned, along the entire stretch of the Pacific slope of the United States.

In this complaint for declaratory judgment and injunctive relief they have set forth that since October, 1953, the defendant has been conducting an experimental operation in the transportation of first-class mail matter, and by the definition the Court makes reference to the fact that it is the sealed envelope type of mail on which there is presently affixed a 3-cent stamp.

The present postmaster has been most efficient, and in his experiments and other fields has demonstrated an efficiency, and has, as the Court recalls, in one very recent instance, been able to demonstrate that tube-transported mail about Manhattan Island of New York is not only inefficient but actually wasteful, and by substituting truck delivery has accomplished a saving. His is to be regarded only as a commendatory endeavor, and the Court in nowise indicates that an able administrator is to be short-circuited by any remarks the Court should make.

That experiment began originally by testing out the possibility of using surplus space on aircraft common carriers, and it originally ran in a very short area between Washington, D. C., and New York City, a distance of approximately some 200 miles. It was then extended and by way of experiment ran between the City of New York and Chicago, Illinois, a distance of approximately 800 miles. It was afterwards extended in the Southeast and ran between points emanating beyond that area but to Jacksonville, Florida, Miami, Florida, as well as Tampa, Florida.

This has been done through experiment. It has also been done through authorization from the Civil Aeronautics Board and there has been an extension of that endeavor so that it has at least on the face of matters at least another year to go.

On October 6, 1954, the defendant filed with the Civil Aeronautics Board a petition to inaugurate such service between points as indicated by the Court, and on the 8th day of November, 1954, the defendant petitioned the Civil Aeronautics Board to fix a temporary rate of compensation.

The present plaintiffs in this cause have been granted the right to participate in those proceedings.

On the 9th of November, 1954, the Civil Aeronautics Board issued an order

to show cause why the temporary rate should not be established, although an order has not been issued by the Civil Aeronautics Board fixing that temporary rate.

It is to be noted that in his application for the rate the Postmaster General almost indicated a ceiling beyond which this Government agency could not or should not grant that rate.

On November 10, 1954, the defendant announced the institution of the present proposed service to take effect on November 22, 1954.

This is somewhat of a different character. It has been represented to the Court that the three experimental areas had to do with feasibility of expediting mail matter, though it be first class, as well as conserving space on aircraft common carriers. The argument is advanced that this particular experiment is to test the feasibility over a long mountainous terrain with intervening points of transfer, and it is to be noted that this experiment is going to cover approximately a thousand miles.

This particular case is especially interesting because of the kaleidoscopic view which one gets from the four corners of the record. One sees the rapidly changing and modernization of American transportation; one sees the biting edges of competition as new forms of transportation come in, and it throws into relief that there are points in competition in which even the railroads because of their peculiar make-up may enjoy an advantage over air transportation.

It has been argued to the Court, and the Court is somewhat astounded by it, that in the transportation area between the Nation's Capital and New York City, the nation's financial capital, the railroad under some conditions is actually faster than travel by air, though I assume the standard speed of the standard trains in those directions does not exceed 60 miles an hour on the average, and the aircraft has now developed until it is cruising at almost 350 miles an hour, and the distance is but 200 miles. But that comes about because of the terminal conditions at either end.

It has also been demonstrated that at times of great weather stress the railroad has something of an advantage over the aircraft carrier.

As against the allegations made in the complaint and the prayer for declaratory judgment and injunctive relief, there was opposition filed to a preliminary injunction which had been prayed for, and that matter in the regular course of the court's business came before my brother Judge Alexander Holtzoff. There has been a hearing on that and Judge Holtzoff has denied the motion for the temporary injunction.

The defendant has answered to the cause and the complaint and both sides have moved for summary judgments, and accordingly the issue is squarely before this particular Court as a tryer of the facts and judge of the law.

Factually, the Court finds that the plaintiffs are five railway corporation common carriers, citizens of the United States, and that they are the principal trunk rail lines between the Mid West and the Far West. The Court finds that the defendant is the Postmaster General of the United States and charged with the handling of mail matter. And the Court specifically finds that the Constitution of the United States under Section 8 of Article 1 in the delegation of authority to the Government of the United States, the people have given Congress the power "to establish Post Offices and post Roads."

As is natural, the Congress has seen fit to put the administration of its delegated authority into the hands of the Postmaster General.

The Postmaster General by his theory of the case points to the fact that he seeks to correct existing deficiencies in the postal transportation system, and that he had the approval of the Comptroller General to institute certain special transportation arrangements to use excess air cargo space for the movement of first-class mail, and again, so we

won't misunderstand, the 3-cent mail type, over selected routes.

■ It is true, and the Court finds as a fact, that the Comptroller General in passing upon the status of the grant of moneys under appropriation acts has ruled, and he is quite correct, that the general grant of funds to run, maintain and operate the Post Office Department do not negate against the experimental use of some of those funds in an effort to improve the efficiency and economy of the mail.

On the date of September 8, 1953, the defendant, pursuant to the Civil Aeronautics Act of 1938, being 49 U.S.C.A. §§ 401 and 486, petitioned the Civil Aeronautics Board to establish rates of compensation for moving certain first-class mail in excess cargo space. As an aside, it has been argued at times that it is immaterial to the Government whether there is excess cargo space which one merely uses on the airplane in order to make a full flight cargo, but the Court is quite of the view that that is not controlling—that space be excess. The impression given, as the Court interprets it, is that it is pretty much a matter of efficiency and somewhat in the field of economy. That is so because the peculiar type of conveyance of the aircraft is such that one simply cannot overload the nose of the ship. It is a type of man-made bird that has to use the feature of the natural bird and it must fly with a certain level and certain distribution of weight. I would gather it is closer to the truth that the effort is where you have space to which additional first-class mail will not add greatly to the bulk, that the Postmaster General has been experimenting in this field. I would seriously question what a good pilot would do if suddenly a large, heavily-weighted box arrived and he had no place to put it but the nose of the ship. I doubt if the ship would ever get off the ground.

However, under that application the request was made for an experimental basis between New York and Chicago and between the City of Washington and Chicago, Illinois. The rate requested was on a "space available basis" subject to prior movement of other traffic and under conditions whereby the service would not be required but would be done at the convenience of the air carrier within the time period established by the Post Office Department.

The Civil Aeronautics Board accordingly established or authorized the establishment of rates considerably lower than the lowest "air mail" service rate, effective for a 12-month period ending September 30, 1954. The actual experimental service was inaugurated, as the Court finds, on October 6, 1953.

Following this the defendant determined that further operations in the Southeastern area of the country, notably, as the Court has referred before, in the State of Florida, were necessary to provide additional experience on which to base further improvements and economies in the postal service. Accordingly, the Civil Aeronautics Board upon petition of the defendant established rates for the same type of mail transportation between New York City, Jacksonville, Tampa, and Miami, Florida, the rates to be effective through September 30, 1954.

The Court points to the fact that in both instances this experiment would conclude within a year and would expire on September 30, 1954. But as is not unusual in administrative endeavors, it has been extended another year although termed "experimental."

Before the expiration of the rates established, certain of the air lines petitioned the Civil Aeronautics Board to extend the rates for an additional 12-month period. At this point 69 railroad common carriers, including the five plaintiffs here, petitioned for leave to intervene and that was permitted.

A similar experimental operation between Seattle, Washington, Portland, Oregon, Salem, Oregon, Eugene, Medford, Klamath Falls, San Francisco, Oakland, Sacramento, Stockton, Modesto, Merced, Fresno, Bakers Field, Los Ange-

les and San Diego went into effect on November 22, 1954.

The Court finds that in the establishment of this experiment it actually covers the entire Pacific Coast from the border of the Dominion of Canada to the border of the Republic of Mexico, so it has the full sweep and covers approximately a thousand miles.

The same railroads petitioned to intervene. The Civil Aeronautics Board denied their petition to intervene in the temporary rate proceedings but allowed them as a matter of discretion to intervene in the proceeding to establish the final rates. The Court stresses this, because later, on the question of jurisdiction and venue, it will have a bearing.

In the actual operation first-class mail carried in this experimental operation is handled by postal personnel transported to aircraft under conditions which differ somewhat from the actual transportation of air mail or mail which bears for a better definition the air mail 6-cent stamp.

Here is one point on which both sides of the trial table clash. It is argued on behalf of the plaintiff that the history and the statutes indicate that air mail implies mail carried through the air by aircraft, and it is argued on behalf of the defendant that what air mail means, reduced to its common and lowest denominator, is that it is a high-priority, high-speed type of mail service, that whether it is carried aloft or carried on the surface it constitutes a high priority.

As the Court remarked before and now finds as a fact, on the 20th of November, 1954, the plaintiffs filed this suit seeking an injunction and declaratory judgment on the grounds that the defendant's action was unlawful, in view of 39 U.S.C. §§ 462a, 463a which provides that the rate of postage on mailable matter transported by mail by air shall be 6 cents per ounce and that plaintiffs would be irreparably injured since they had transported practically all the first-class mail in the area of the Pacific slope of the Continental limits of the United States.

On that fact it would appear from the record that these big five trunk railroads to come within that allegation that they do transport the overwhelming bulk of the present first-class mail up until the time of the experiment.

As the Court remarked, on the 24th of November, 1954, plaintiffs moved for a preliminary injunction and after hearing Judge Holtzoff has denied it.

Foremost among the findings of fact and conclusions of law lie the question of what is this type of mail which bears the 3-cent stamp as opposed to that which bears the 6-cent air mail stamp. In the Constitution itself the people, jealous of their rights, specifically gave Congress the right to establish "post offices and post roads."

With the first of these two there is not much clash or difference between both sides of the case, and it begins to shape up in the definition of a post road. Post roads do not mean, as our founding fathers may have thought at the time, that they technically were roads somewhat like the king's highway over which this feature of governmental service passed by the use of those roads through its agents. It has been given a much broader view and today it represents those arteries of transportation which are adaptable to the use of transporting mails.

Now to determine what the Congress intended since Congress had the primary power at the outset in the conveying to the Postmaster certain duties, there has been argued to the Court that in the statute of 1872 broad powers were given and therefore since he had the right of selection of post roads, he, the Postmaster General, has the right today to select whatever roads in the sense of transportation arteries best serve the purpose for which he has been placed in office.

On the other hand, there is a very strong showing that when situations arose where one would normally think the broad grant of power would carry with it the ancillary power to act in

emergencies, the Postmaster General has gone back over the past 80 years to the Congress to get instruction, to get authority.

He did so when the experiment arose as to the use and the settling of the rate for parcel post. He did so when emergencies dictated the creation by Congress of the star route legislation; and, though it is a small item in one particular, yet it nevertheless points up rather strongly the situation today, when a problem arose in the Territory of Alaska. Here, apparently, under the theory of the implied power to contract, the Postmaster had contracted for delivery of mail; then the Civil Aeronautics Board was created. There seemed to be a hiatus in the legislative impact. Authority delegated by the Congress was withdrawn, and then it was later granted by express statute.

It would appear to the Court, sitting in interpretation of the intent of Congress, that both parties to the problem, the Executive on the one hand, represented by the Post Office, and the Legislature on the other, recognized that the Congress was the sole arbiter of what should be the powers in that field at that time of the Postmaster. And yet it is somewhat the problem that we are faced with in this case.

It has been pointed out that this experiment was recognized by the Congress in the form of the fact that the hard-working, very efficient and all-powerful appropriations committees of both sides of Congress, the House of Representatives and the Senate, knew by reporting that this experiment was going forward. It is argued on behalf of the Postmaster that in the legislation that appropriated sums of money to carry on his department, the Senate saw fit to refer to this experiment then going on, and the House report which was more voluminous, omitted it. Then it is urged that because the appropriations committee required quarterly reports, that those indicate notice, as was the case of Brooks v. Dewar, 313 U.S. 354, 61 S.Ct. 979, 85 L.Ed. 1399.

One has to know the function of the appropriation committee and the means by which our Congress operates to appreciate that that is not a tenable argument.

First of all, there is a standing rule in the Congress that one may not have legislation in an appropriations act and it is subject to the very striking attack of a point of order. All Congressmen and all Senators know that, and in the House of Representatives it is especially dealt with constantly. So that if it is a matter that in broad legislation, appropriating nearly a billion dollars, reference is made to the quarterly reports, it is merely a watchdog procedure which that very efficient committee, the appropriations, uses, so that it will be abreast of needs, because deficiency appropriations are likely to come, surpluses build up, and the committee wants the information.

■ The Court is going to rule as a matter of fact and law that the mere notice to the appropriations committee in quarterly reports, and the assertion in the Senate report of knowledge of this experiment do not constitute ratification and will not preclude the plaintiffs from seeking relief if they are entitled to the same.

The Court is bolstered in that because at one point, the experimental use of services in connection with transportation of mail by air, to include the autogyro, was given the Postmaster by the Act of April 15, 1938, 52 Stat. 218–220. It had a limitation. It set up standards, and it also provided a limitation of its life and was later repealed.

That is the way our Congress generally works. If there is to be the creation of the object, it is usually set forth with enough detail that the public and the authority created will know.

It may well be that the American people are on the verge of a new classification of mail matter. It may well be that, as the Postmaster argues, it is actually the role which the postage stamp has finally got. There is the over-all of high-priority service; surface transportation; private letter communication; then there is the bulk service that goes

along at somewhat lesser charge and at somewhat lesser speed.

In that particular it is not unlike the present situation we find with the American telegraph, that there is a type of message denominated telegram, that goes out immediately, for which there is a high priority and dispatch, and a higher charge; there is a day letter that usually runs two to three hours behind the actual deposit of the message, with a lesser cost; and there is a third class of the night letter which, when the wires are available, go forward, which might be immediately or at a subsequent time, and which are not delivered before 8 o'clock the following day at the place of receipt.

I use this as an analogy because it may be that as we move ahead in the years ahead there will be a different classification and we will no longer speak of second class, third class, fourth class mail, but we will speak of high priority, deferred priority, medium service and slow service, so that whatever one contracts with his Government, he knows that he is going to get that type of service for the amount of money that he pays.

■ However, fortunately, the courts do not set policies. They have the problem of interpreting legislation.

Here is the crux of the problem: The Congress has declared by its statute that mail matter of a certain type shall take a 6-cent postage rate. Congress has declared that certain mail of another kind shall take a 3-cent postage rate.

It is noteworthy that when these regulations first came to the Postmaster, in his instructions, he declared in his regulations that the domestic air mail should embrace all mailable matter being transported as mail by air "within the continental limits of the United States;" and when the rate is fixed at 6 cents, the regulation said, and I quote, "The rate of 6 cents an ounce or fraction of an ounce will apply to all domestic air mail weighing up to and including 8 ounces, regardless of distance or zone. The zone rates prescribed by this section will apply to

such mail weighing over 8 ounces, fractions of a pound being charged as a full pound."

The United States Official Postal Guide, Part I, dated July, 1953, under Chapter II, entitled "Domestic Mail Matter," carried the following Article 12:

"Air-Mail and air parcel-post rates. The rates of postage in this article apply to mail transported by air." Of course, parenthetically air parcel post has been established by statute, just like the surface transportation of bulk mail was established, and the great parcel post came into being.

In the history of the matter Congress has repeatedly laid down the limits under which the mail should fall. Judge Holtzoff in one of his findings has made a finding that the present experiment is in the public interest. As this Court interprets his finding, it is predicated upon the proposition that if the public receives faster dispatch of mail under a 3-cent postage stamp and enjoys a saving in a pecuniary sense, that he would otherwise have to pay double that rate to have that mail matter go on an airplane, then his finding may be correct, but this particular Court feels that the public interest in this matter is of a greater compass than the sheer economy of money or the saving of time.

In these modern days with modern transportation and with all the drawbacks that the poor old lumbering freight car has, it is still the backbone of the American system of transportation. If one starts to cut off the tentacles of a great transportation system, then the strength that came through those tentacles will disappear and the main trunk and backbone will suddenly develop economic arthritis. It may be that the glamour of the newer members in the transportation field with their greater speed may attract competition, as it should, but in times of stress and emergency the Government of the United States and its people has always looked to the railroads.

In that broader sense I would doubt that the public interest would be paramount where you are saving time or money, but this Court is going to rule that the public interest is of such compass that it will have to be virtually a matter of Congressional delimitations to spell out the public interest as against that clash of which is better for the country, transportation by rail or transportation by air. It may come to a compromise and establish a new type.

The Court stresses that because the Court will now rule as a matter of law that the Postmaster General is acting beyond those limits of authority delegated to him by the Congress of the United States, which has from the people the sole directive to establish post offices and post roads.

As I make this finding, I want to move quickly over to the field of jurisdiction and venue.

█ This particular court, the United States District Court for the District of Columbia, is unusual in the Federal setup because in addition to its broad federal powers it also has a common law jurisdiction. The Congress of the United States under the legislation promulgated for the Post Office Department has given him power sufficient that he can prescribe and has and does compel these railroads to maintain unusual and peculiar type of equipment. It is equipment that goes out with the passenger trains, and if they are compelled to take it, set it up as a means of being equipped; if they are to be denied its use under another administrative procedure, then there will become an impaired use, they have suffered an economic loss, and under a broad common law complaint they have a cause of action.

Again this Court has the broad equitable powers of a common law Court, and where there is an unfair practice indulged in by one, or preferences are made in an equal field of competition, it would appear that under its broad equitable powers in the field of mandatory and restraining injunctions that again this Court has jurisdiction.

This Court will also rule that by virtue of the Administrative Procedure Act, Section 10(a), 5 U.S.C.A. § 1009(a), in particular, and the others touching on the question of jurisdiction, that in the language as employed, "any person," and that means both natural and corporate, "suffering legal wrong because of any agency action, or adversely affected or aggrieved"—and at this point, parenthetically speaking, the Court will rule that this is an agency action on the part of the Postmaster—"by such action within the meaning of any relevant statute" —the relevant statutes come out of the fixing of the mail rate prescribing its type, the relations between the legislative branch on the one hand and the administrative on the other over this long period of years—"shall be entitled to judicial review."

Here, of course, these railroads are being adversely affected, and they are also aggrieved by this situation.

█ The Court will rule, therefore, that it does have jurisdiction. And the Court will make these following conclusions of law:

The Court will rule that it does have jurisdiction under its common law powers, under its equity powers, and by virtue of the Administrative Procedure Act.

█ The Court will therefore rule that the plaintiffs have a standing to sue, that their type of relief is the type which normally would flow from this type of complaint.

█ The Court will also rule that as a matter of law, under the grant of moneys to run, maintain and operate the Post Office, the Postmaster General did have the right to experiment, his actions in that sense are not unlawful, but the Court will rule that prolonged experiments which by the running of time demonstrate that the knowledge acquired by the experiment has been received and that it is a promulgation of an executive attempt to usurp the power of the legislative function is unlawful.

Of course, in the present posture of the case there is the experiment between Washington and New York, Chicago and Washington, and the experiments conducted in Florida. But these parties before me as plaintiffs are not affected by that.

The Court will rule as a matter of law that the Postmaster has a right to make this experiment on the West Coast, limited, as the Court said, in that it shall not be unduly prolonged.

Since this action began in November, the only matters before the Court are on affidavits, and they do not show at the moment an irreparable injury to the plaintiffs.

Accordingly, the Court will grant judgment on the motion of the plaintiffs for summary judgment and rule that prolonged experimental dispatch of first-class mail by air without Congressional sanction is not a power granted to the Postmaster General of the United States. On the other hand, for the failure at this point of the plaintiffs to show irreparable injury the motion for permanent injunction will be denied.