301 F.2d 835
 112 U.S.App.D.C. 248, 44 P.U.R.3d 50
 CONNECTICUT COMMITTEE AGAINST PAY TV, Stanley Warner
Management Company, Loew's, Inc., Connecticut
Theatres, Manchester Drive-In Theatre
Corporation, Outdoor Theatres
Corporation, Appellants,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee, RKO Phonevision
Company, Intervenor.
CONNECTICUT COMMITTEE AGAINST PAY TV et al., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION, United States of America,
Respondents, RKOPhonevision Company, Intervenor.
 Nos. 16278, 16315.
 United States Court of Appeals District of Columbia Circuit.
 Argued Dec. 1, 1961.
Decided March 8, 1962.
 
 Mr. Marcus Cohn, Washington, D.C., for appellants in No. ,16278 and petitioners in No. 16315.
 Mr. Martin Jay Gaynes, Washington, D.C., entered an appearance for appellants in No. 16278 and petitioners in No. 16315.
 Mr. Paul Dobin, Washington, D.C., also entered an appearance for petitioners in No. 16315.
 Mr. Max D. Paglin, Gen. Counsel, Federal Communications Commission, with whom Mr. Daniel R. Ohlbaum, Asst. Gen. Counsel, Federal Communications Commission, was on the brief, for appellee in No. 16278 and respondent in No. 16315.
 Mrs. Ruth V. Reel, Counsel, Federal Communications Commission, also entered an appearance for appellee in No. 16278.
 Mr. Richard A. Solomon, Atty., Dept. of Justice, entered an appearance for respondent United States of America in No. 16315.
 Mr. Harold David Cohen, Washington, D.C., with whom Mr. W. Theodore Pierson, Washington, D.C., was on the brief, for intervenor.
 Mr. Vernon D. Kohlhaas, Washington, D.C., also entered an appearance for intervenor in No. 16278.
 Before EDGERTON, BASTIAN and BURGER, Circuit Judges.
 BURGER, Circuit Judge.
 
 
 1
 This matter comes to us on a consolidated proceeding arising out of an appeal under Sec. 402(b) of the Communications Act of 1934, 48 Stat. 1064, as amended, 47 U.S.C.A. 151 et seq., and on a petition for review under Sec. 402(a) of the Act. Both the appeal and the petition seek review of a Report, Decision and Order of the Federal Communications Commission granting RKO Phonevision Company, the Intervenor authority to conduct a three year trial operation of 'pay' or subscription television in Hartford, Connecticut, to be operated by Zenith Radio Corporation Phonevision system.
 
 
 2
 In 1955 the Commission issued a Notice of Proposed Rule Making in which it sought an expression of views from interested parties on the question whether the Commission had the power to authorize pay-television operations and, if it had such power, whether such operations would be in the public interest. Subsequently the Commission issued a series of reports which in essential part concluded that the Commission had statutory power to authorize some form of direct payment or subscription television system. The several reports set forth the following among the conditions under which such a system would have to operate initially: (1) trial authorization would be limited to a three year period; (2) the public could not be forced to purchase any special receiving equipment; (3) the licensee would be required to retain full freedom of program choice and subscription rates to be charged; (4) the trial of any one system would be limited to any one of the twenty major markets which have four television stations. Hartford is one of those areas.
 
 
 3
 In June, 1960, the RKO Phonevision Company, purchaser of the assets of television station WHCT in Hartford, applied for authority to utilize that station for a pay-television trial under the terms established by the Commission. The RKO Phonevision Company is a wholly owned subsidiary of RKO General, Inc., and will hereafter be referred to as RKO. Hearings on the application were held before the Commission in October, 1960 and in February, 1961 the application was granted.
 
 
 4
 In essence RKO proposes to provide subscription television programs over WHCT approximately 40 hours a week, of a total 70 hour broadcasting schedule, using a 'Phonevision' system which is supported by direct payment of charges by subscribers.[1] During these forty hours the signal beamed from WHCT will be garbled or 'scrambled' by an encoding device, thus preventing general reception. Those who wish to subscribe will rent a decoding mechanism provided by the Phonevision System which when attached to their conventional television receivers will decipher the garbled signal and convert it into a normal image on the television screen. Installation of the decoder in the subscriber's set will cost an estimated $7.50 to $10 and rental charges on the decoder thereafter may not exceed $.75 weekly. Subscribers will be free to terminate subscriptions at the end of any month. The Intervenor contemplates a maximum of 40,000 subscribers.
 
 
 5
 Individual program cost will vary from $.25 to $3.50 with the majority of offerings predicted to fall within the $.75 to $1.50 range. Subscribers will be billed on the basis of a record of usage kept by a paper billing tape installed inside the decoder which will perform the function of a meter. Since the entire operation is to be financed by this direct payment arrangement, no commercial messages will be broadcast during the 40 hours this system is operative.
 
 
 6
 At the time of the Commission's decision, RKO had done no more than discuss and explore probable programming with prospective suppliers of contemplated program material, and had neither made nor received any firm commitmemts as to precisely what would be televised once the subscription broadcasting operation commenced. Plans called for a major portion of the forty hours of subscription time to be devoted to first run motion picture films, with the residue of time given to legitimate theatre, opera, ballet, concerts, educational features, art and children's films, and sports features as they occur and are available. The Commission predicted that programmimg along these lines should not entail substantial limitation on the types of programs the Hartford public would see generally, since with only insignificant exceptions the same or similar programs which the subscription system would displace in the WHCT broadcasting schedule would be offered by other stations in the Hartford area.
 
 
 7
 The Commission necessarily could not predict what if any adverse economic impact a subscription system would have upon the balance of the Hartford area television industry, but reasoned that the public need and utility of experimenting with such a system justified whatever unknown economic risks might be incurred during a trial period. Similarly the extent of harmful diversion of existing 'free' television programs away from local stations to the subscription outlet could not be demonstrated, and the Commission concluded that any final appraisal of this potential problem could not reasonably be resolved prior to the outcome of the trial operation itself. In short the very purpose of the porjected experiment is to explore these unknown and unpredictable factors.
 
 
 8
 The appellant Connecticut Committee Against Pay TV is an organization representing Hartford theatre owners and other interested local groups. It argues on this appeal, inter alia, that (1) the Commission lacks statutory power to authorize a television broadcast system which requires the direct payment of fees from the public; (2) the Commission erred in granting the temporary license to RKO without knowing what programs WHCT would in fact telecast and (3) that the Commission erred in concluding that RKO's proposed programming plans would serve the public interest. We have examined these contentions carefully in view of the importance of the questions to the public and to the industry; in its precise form the chief question presented is one of first impression.[2]
 
 
 9
 The Federal Communications Commission was established in 1934 under a typically broad grant of power by which the Commission was authorized by Congress, subject to limitations not pertinent here, to issue a broadcasting station license to any applicant 'if public convenience, interest, or necessity will be served thereby.' 47 U.S.C.A. 307(a). Additionally, Congress specifically commanded the Commission by Sec. 303(g) of the Communications Act, to 'study new uses for radio, provide for experimental uses of frequencies, and generally encourage the larger and more effective use of radio in the public interest.' The plain language of the statute thus makes clear that Congress placed an affirmative duty on the Commission to experiment with and develop the most desirable deployment and utilization of the nation's communications facilities. The Supreme Court has said that 'where the language of an enactment is clear, and construction according to its terms does not lead to absured or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended.' United States v. Missouri Pac. R.R. Co., 278 U.S. 269, 278, 49 S.Ct. 133, 136, 73 L.Ed. 322 (1929).
 
 
 10
 The distinguishing characteristic of the Federal Communications Commission's authorization of subscription television in this case is the experimental or trial basis upon which the system is to operate for the duration of its three years authority. That three years is the normal life of a conventional license does not alter the essentially experimental nature of the grant. We think it not reasonable to assume that the worst will happen and that the public convenience, interest or necessity will be so undermined by such a trial as to require us now, at this stage, to invalidate the WHCT license. By their very nature the grants of operating authority for which regulatory agencies issue certificates relate to the public convenience and necessity of the future and much about the future is unpredictable. See American Airlines v. C.A.B., 89 U.S.App.D.C. 365, 192 F.2d 417 (1951). It seems to us that unless the future of television is to be confined to its present state the Commission must be reasonably allowed opportunity to experiment. Difficulties are foreseeable, as both RKO and the Commission readily acknowledge, but if the difficulties are overcome the public benefits anticipated by the Commission warrant the risks of the experiment. Should the problems and difficulties exposed by the experiment fulfill appellant's prediction of harm to the public interest, then the FCC has retained power to terminate the experiment upon notice and hearing at any time prior to the expiration of the license at the end of the three year period. And of course the Commission has the power to decline to renew the license once three years have expired. We cannot assume the Commission will abdicate its powers or fail to keep this important experiment under close and constant scrutiny.
 
 
 11
 The Commission has declared its determination to oversee carefully the form which programming takes under the subscription system. Surely its power to see that this area of the public domain is used in the public interest is not less for 'paid' television than for the existing system of so-called 'free' television. While it is reasonable not to require the licensee to commit itself now to definite named programs until the wishes of the subscribers have been more completely sounded, and the potential sources of program material more fully explored, nevertheless it seems to us imperative that the licensee be held to adhere faithfully to the high standard of programming which it has promised. To say the Commission cannot exercise supervision to that end would denude the experiment of its creative potentialities and dilute the Commission's power to make a final appraisal when the experiment is completed.
 
 
 12
 Affirmed.
 
 
 
 [1]
 We note that the remaining 30 hours given to 'free' television broadcasting meets the FCC requirement of a minimum 28 hour broadcasting week. 4 C.F.R. 3.651(2)
 
 
 [2]
 Other subscription services, specifically the Muzak enterprise and FM radio's Functional Music projects, have been found perfectly acceptable by both Commission and the courts. See Functional Music, Inc. v. F.C.C., 107 U.S.App.D.C. 34, 274 F.2d 543 (1958), cert. denied, 361 U.S. 813, 80 S.Ct. 50, 4 L.Ed.2d 81 (1959); Muzak Corporation, 8 F.C.C. 581 (1941)