**UNITED TELEGRAPH WORKERS, AFL–CIO, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

**Western Union Telegraph Company, Intervenor.**

**No. 23852.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 22, 1970.

Decided Dec. 4, 1970.

Mr. Isaac N. Groner, Washington, D. C., with whom Mr. William Kanter, Washington, D. C., was on the brief, for petitioner.

Mr. Stuart F. Feldstein, Counsel, Federal Communications Commission, with whom Messrs. Henry Geller, General Counsel, and John H. Conlin, Associate General Counsel, Federal Communications Commission, were on the brief, for respondent, Federal Communications Commission. Mrs. Lenore G. Ehrig, Counsel, Federal Communications Commission, also entered an appearance for respondent, Federal Communications Commission.

Mr. Lee A. Rau, of the Bar of the Supreme Court of California, pro hac vice by special leave of Court, for respondent, United States of America. Mr. Howard E. Shapiro, Atty., Department of Justice, also entered an appearance for respondent, United States of America.

Mr. Melvin Richter, Washington, D. C., with whom Messrs. Jack Werner, Washington, D. C., Sidney Goldman and Harold L. Talisman, Washington, D. C., were on the brief, for intervenor.

Before BAZELON, Chief Judge, WILBUR K. MILLER, Senior Circuit Judge, and DAVIS,* Judge, United States Court of Claims.

DAVIS, Judge:

Western Union filed with the Federal Communications Commission a tariff which became effective January 1, 1970 for a new service called Mailgram which it proposed to offer in cooperation with the Post Office department for a two-year experimental period. United Telegraph Workers, the union which represents all of Western Union's employees in the continental United States,[1] petitioned to suspend the tariff. The Commission denied the petition, without a formal hearing, in a memorandum opinion and order of which the union now seeks review.

The Mailgram experiment is an attempt to test the feasibility of a record message service intermediate in speed and cost between conventional telegrams and first class mail.[2] This interim serv-

---

* Sitting by designation pursuant to Title 28, U.S.Code, Section 293(a).

1. Except for a unit of 3,000 employees in New York City represented by the Communications Workers of America, AFL-CIO.

2. In 1962 the Commission began a broad inquiry into domestic telegraph service which was induced in part by a recognition that Western Union (which is the basic provider of telegraph service) faced serious problems which could impair its ability to provide the "requisite standard of service" to the public. Domestic Telegraph Inquiry, 27 Fed.Reg. 5353, 5354 (1962). The inquiry produced a report (Report of the Telephone and Telegraph Committees of the Federal Communications Commission in the Domestic Telegraph Investigation (Docket No. 14650) April 29, 1966.), which noted that one

ice will be available to Western Union's Telex[3] and Info-Com[4] subscribers in twelve designated cities[5] in the continental United States. Through teleprinters on their premises, these subscribers will be able to dial into Western Union's communications network and transmit messages to 110 post offices strategically located in the 48 contiguous states and the District of Columbia in which receiving teleprinters are to be installed. There postal employees will remove the message from the teleprinter, scan it for completeness and legibility, and fold and insert it in a window-envelope for placing in the first-class mail stream. For each Mailgram placed in the mail Western Union will pay the Post Office Department twenty-five cents, consisting of a fifteen-cent handling charge and the ten-cent domestic air mail postage fee.

The Commission's refusal to suspend the tariff is challenged on several fronts. The perspective from which we must examine those attacks is that, at this stage, the program is temporary and experimental. While the Commission's order is clearly final for purposes of judicial review, Isbrandtsen Company v. United States, 93 U.S.App.D.C. 293, 211 F.2d 51, cert. denied sub nom. Japan-Atlantic and Gulf Conference v. United States, 347 U.S. 990, 74 S.Ct. 852, 98 L.Ed. 1124 (1954), the only project approved was for a two-year term and was frankly experimental in character. The Commission made it clear that it viewed the program in that way, and so must we. We do not have before us a permanent Mailgram undertaking or one of indefinite duration, and we do not decide the legality of such a plan.

■ The petitioner claims, first of all, that any Mailgram project necessarily violates a "historic telecommunications policy" of Congress which forbids any cooperative service furnished jointly by Western Union and the Post Office Department—a policy which is said to precede and be infused into the Communications Act of 1934. The foundation on which this imputed policy rests is the failure of Congress to enact various proposals made during the last hundred years for public ownership or operation of the telegraph system. See, e. g., S. Doc. No. 399, 63d Cong., 2d Sess. (1914) (App. A, pp. 18 et seq., "Historical Résumé of Agitation for Government Ownership of the Telegraph and Telephone of the United States"). But even if we recognize arguendo a currently vital congressional policy, founded on such inaction, against public ownership or operation of the telegraph, we find nothing in the Mailgram experiment which is inconsistent. Mailgram in no sense represents a government takeover of the telegraph system, nor the establishment of post offices as places from which to transmit telegrams. Western Union will continue to offer its full conventional telegram service during the two-year span. Mailgram will be available only to certain of Western Union's customers who will originate messages on the company's equipment and transmit them over its communications network. The Post Office's sole involvement will be in preparing mailgrams for mailing, after receipt over the telegraph wires, and in

means of improving telegraph service might be a "partial utilization" of postal facilities. Id. at 299.

3. Telex is an automatic teleprinter exchange service which allows each subscriber to send and receive record messages through teleprinters installed on his premises. Both the sender and the recipient must have teleprinters.

4. Info-Com is a share-system network of limited availability designed to provide private record communication for general business operations through computer-

controlled message switching and message storage and retrieval. Info-Com is integrated with other Western Union services, so that an Info-Com subscriber can send messages automatically through the Telex, public message, and TWX networks.

5. The cities are Atlanta, Ga.; Boston, Mass.; Charlotte, N. C.; Cincinnati, Ohio; Dallas, Texas; Denver, Colo.; Detroit, Mich.; Kansas City, Mo.; Miami, Fla.; Newark, N. J.; Seattle, Wash.; and Washington, D. C.

delivering them as first-class mail. The materials petitioner cites as evidence of the Congressional policy it invokes concerned efforts by the Post Office to acquire or lease telegraph wires and facilities for public use, to integrate telegraph communications as a normal part of the postal system (as in other countries) by contract, or to make post offices available as regular depots for the public sending of wires.[6] Whatever policy may be drawn from those incidents does not at all reach to the very limited cooperation between the Department and Western Union in the proposed Mailgram System. There has never been a policy against *any* cooperation between telegraph companies and the Post Office. Indeed, Mailgram is not much of a step beyond the common and traditional practice of delivering copies of telegrams through the mail.

The next question is whether approval of experimental Mailgram is beyond the Commission's authority under the Communications Act of 1934, 47 U.S.C. §§ 151 et seq.—apart from the alleged historical policy we have just discussed. The Act grants the Commission broad responsibility to forge a rapid and efficient communications system,[7] and broad authority to implement that responsibility.[8] Courts have interpreted the agency's powers liberally, recognizing that it was not the Congressional purpose to "stereotype the powers of the Commission to specific details in regulating a field of enterprise the dominant characteristic of which was the rapid pace of its unfolding." National Broadcasting Company v. United States, 319 U.S. 190, 219, 63 S.Ct. 997, 1011, 87 L.Ed. 1344 (1943). Thus, the Supreme Court upheld the Commission's assertion of jurisdiction over community antenna television systems, even though the Commission had unsuccessfully sought specific legislative authorization for that jurisdiction. United States v. Southwestern Cable Company, 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968). In Connecticut Committee Against Pay TV v. FCC, 112 U.S.App.D.C. 248, 301 F.2d 835, cert. denied, 371 U.S. 816, 83 S.Ct. 28, 9 L.Ed.2d 57 (1962), this court upheld the Commission's right to authorize a three-year experiment in subscription television service. The opinion for the court by Judge (now Chief Justice) Burger emphasized the trial and experimental nature of the operation. Later in a case involving Commission rules regulating a permanent subscription television system, the court felt it appropriate to give "fresh consideration" to the question of whether the Commission had authority to license pay television for an indefinite period. National Association of Theatre Owners v. FCC, 136 U.S.App.D.C. 352, 357, 420 F.2d 194, 199 (1969), cert. denied, 397 U.S. 922, 90 S.Ct. 914, 25 L.Ed.2d 102 (1970).

The experimental nature of the service now before us is equally significant. The Commission has a mandate under § 218 of the Act, 47 U.S.C. § 218 (1964), to inform itself of technical advancements and improvements in modes of communication so that "the benefits of new inventions and developments may

---

6. The union relies heavily on the failure of the so-called Hubbard and Wanamaker proposals in the nineteenth century, and on an opinion of Acting Attorney General Taft, 19 Op.Atty.Gen. 650 (1890). These clearly involved plans that members of the public be able to go to post offices, as they go to telegraph offices, to transmit telegrams. Nothing petitioner has cited in the long history of federal telecommunications policy has *any* significant bearing on the very restricted type of cooperation between the Post Office and the telegraph companies involved in the Mailgram experiment.

7. The Commission is "to make available, so far as possible, to all the people of the United States, a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges * * *." Communications Act of 1934 § 1, 47 U.S.C. § 151 (1964).

8. The Commission "may perform any and all acts * * * and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions." Communications Act of 1934 § 4(i), 47 U.S.C. § 154(i) (1964).

be made available to the people of the United States." This expression of congressional desire that the Commission encourage technological innovation requires us to demand a compelling showing of legislative prohibition before we strike down an experiment such a Mailgram which is designed to furnish the informational input that makes such innovation possible.

No such showing has been made. Petitioner points out that in general the Act contemplates private operation of "wire communication" (see, e. g., 47 U. S.C. § 153(h), (i)), but this expectation that private companies continue to be the normal transmitters of telegrams does not, in common sense, forbid ancillary, incidental, supplemental, or accessorial help by a federal agency.[9] The supposed dilemma that, while the postal segment of Mailgram is part of the statutory "wire communication" to be regulated by the Commission (because it entails the "delivery of communications", 47 U.S.C. § 153(a)) it cannot be so regulated because the Commission has no authority over other federal entities, need not be resolved at this stage in analytic terms. If it turns out, as a result of the experiment, that there is need to control the end-portion of the service, it can then be decided whether the Commission can (and should) issue orders to the Post Office directly, or whether it should rather proceed by conditioning its approval of Western Union's further participation upon compliance with certain requirements as to mailing and delivery. The short of it is that, on the one side, there is nothing in the Act which must be read, against the background of the large authority granted the Commission, as a prohibition against the limited cooperation challenged here, and on the other it would diminish that broad authority, and disserve the general aim of the statute to foster innovation, to parse the particular words of the Act so strictly and so narrowly as to outlaw at the start an experiment in cooperation of this limited type which the Commission considers useful and which seems moderate and sensible on its face.

Petitioner also asserts that the Commission was required to hold a hearing on the request to suspend the tariff, and that such a hearing would have revealed that the Mailgram experiment was not in the public interest. There is a preliminary issue as to which provision of the Communications Act governs the need for a hearing. Western Union and the Commission treated Mailgram as a new service which became effective automatically, according to the filed tariff, under § 204 of the Act, 47 U.S.C. § 204 (1964). Petitioner claims for the first time on appeal that Mailgram is a "new line" or "channel of communication" within § 214 of the Act, 47 U.S.C. § 214 (1964), calling for prior Commission approval in the form of a certificate of convenience and necessity, which can come only after a hearing. We do not believe that § 214 applies to this Mailgram experimental proposal. While the physical contruction of new facilities or of extensions may not be a sine qua non to applying the provision (See Hearings on S. 2445, S.Comm. on Interstate and Foreign Commerce, 77th Cong., 2d Sess., 184, 262 (1942)), the certification requirement of § 214(a) does seem to require some more substantial change in existing services than is present here. Mailgrams may be sent only by Western Union's Telex and Info-Com customers in the designated cities. These subscribers can already send messages throughout the country, providing either that the recipient has a receiving teleprinter or that they use Western Union's public message network and delivery facilities. Furthermore, the mails are currently used to send confirmatory copies of tele-

---

9. Examples: The Post Office delivers telegrams mailed by Western Union; until recently telegrams to Alaska went through the Alaska Communications System, an Air Force agency whose lines interconnect with Western Union; there is a link between Western Union and a governmentally operated system for communication with spacecraft.

grams delivered by telephone or wire. All Mailgram does is to place receiving teleprinters in post offices so that messages can be sent long distances by Western Union wire and then delivered in ordinary course as local mail. This limited and temporary combination of existing facilities does not rise to the magnitude of a new line or channel of communication requiring certification.[10]

Any requirement of a hearing must therefore be found in § 204 under which the tariff was filed. Section 204 is by its terms permissive,[11] and allows the Commission in its decretion to hold a hearing on the lawfulness of the filed tariff. See Public Utilities Commission of California v. United States, 356 F.2d 236, 240 (9th Cir.), cert. denied, 385 U. S. 816, 87 S.Ct. 35, 17 L.Ed.2d 54 (1966). To hold that a hearing was required here we must find that the Commission abused its discretion in denying one.[12] Before the agency petitioner evoked various consequences of experimental Mailgram, the most serious being that it would cause substantial diversion of Western Union's conventional telegram business and impair the job security of its employees. The Commission found these claims to be highly speculative on their face, a conclusion which we cannot overturn. First, it is impossible *to predict with any confidence* the extent to which mailgrams will be used instead of regular telegrams; indeed a prime purpose of the experiment is to obtain data on the basis of which such a projection may be made. Moreover, it

appears unlikely that any substantial·diversion of the telegram business would occur in the two-year period. Mailgrams will not be available to the general public at all, and will be available to Western Union's Telex and Info-Com subscribers in only twelve cities.[13] There is not the slightest hint of injury to other communications systems, or any complaint from them. Similarly, it is difficult to see any adverse impact on Western Union's employees. As of the time of argument, no employee had been discharged because of the commencement of this service. Nor are such discharges probable within the rest of the two-year period. Mailgram being now only an experimental service, its results must be evaluated by Western Union, the Post Office, and the Commission before any decision as to permanent implementation. In addition, the Commission has stated that any requests by Western Union to close public telegraph offices as a result of Mailgram would receive careful scrutiny.

For these reasons, the Commission did not abuse its discretion in concluding that a hearing was not necessary to probe further before authorizing the two-year experiment. Cf. *Marsh v. FCC*, 140 U.S.App.D.C. ——, at ——–——, 436 F.2d 132, at 134–135 (1970). This court has recognized that there are circumstances in which "a month of experience will be worth a year of hearings." *American Airlines, Inc. v. CAB*, 123 U. S.App.D.C. 310, 319, 359 F.2d 624, 633, cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17

10. We need not now decide whether experimental Mailgram falls entirely outside § 214 or whether it is excluded by the provisos which except "local, branch, or terminal lines not exceeding ten miles in length" and permit the Commission to authorize "temporary or emergency service, or the supplementation of existing facilities."

11. "Whenever there is filed with the Commission any new charge, classification, regulation, or practice, the Commission *may* either upon complaint or upon its own initiative without complaint, upon reasonable notice, enter upon a hearing

concerning the lawfulness thereof * * *" (1964). [Emphasis added.]

12. The cases cited by petitioner (*Marine Space Enclosures, Inc. v. FMC*, 137 U.S. App.D.C. 9, 420 F.2d 577 (1969); *Sea-Land Service, Inc. v. Connor*, 135 U.S. App.D.C. 306, 418 F.2d 1142 (1969)) in support of its right to a hearing do not aid since they were decided under statutes requiring hearings in those circumstances.

13. Notably absent from the twelve are such centers of telegraphic communication as Chicago, Ill., Los Angeles, Cal., New York, N. Y., and San Francisco, Cal. See Note 5 *supra*.

927

**926**

L.Ed.2d 75 (1966). *American Airlines* upheld a Civil Aeronautics Board regulation that only all-cargo carriers could provide blocked space service, a regulation which was promulgated without a full hearing. In a recent case also involving the CAB, we held that the Board acted within its discretion in approving an International Air Transport Association fare agreement without a hearing. National Air Carrier Association v. CAB, 141 U.S.App.D.C. ——, at ——, ——, 436 F.2d 185, at 194, 195 (1970). That opinion indicated—and the same principle is applicable here—that the court's inquiry into the factual underpinnings of agency action authorizing a temporary program or giving it interim approval will appropriately be less searching that if we were faced with the institution of a permanent program. For, as the court said in another comparable context, "the very purpose of the projected experiment is to explore these unknown and unpredictable factors." Connecticut Committee Against Pay TV v. FCC, *supra*, 112 U.S.App.D.C. 248, 259, 301 F.2d 835, 837 (1961).

The final set of objections to the Commission's refusal to suspend the tariff concerns the legality of Post Office participation in the Mailgram experiment. The Commission declined to rule on this issue, stating that the Post Office Department should resolve the question of its own authority. Petitioner contends that this failure to rule was error, and has initiated a suit against the Postmaster General attacking such participation and seeking an injunction against it.[14] Since we determine the legality of Post Office participation, it is unnecessary to decide whether the Commission should have passed on it below.

For many years telegrams delivered by wire or telephone have been confirmed by mailing a copy to the recipient. The Post Office handles these tele-

grams, as it will mailgrams, as first-class mail pursuant to 39 U.S.C. § 4251(a)(3) (1964). The changes from this practice under Mailgram are, as we have said, that receiving teleprinters will be installed in post offices and that postal employees, rather than Western Union's, will scan and insert the messages into envelopes for mailing. Mailgram is still an experiment, and the Post Office Department has clear authority under 39 U.S.C. § 504(a) (1964) for engaging in experiments as part of a research and development program to improve the economy and efficiency of its business. Under the predecessor versions of § 504,[15] this court gave a broad interpretation to these powers of the Post Office. Atchison, T. & S. F. Ry. Co. v. Summerfield, 128 F.Supp. 266 (D.D.C.), rev'd in part, 97 U.S.App.D.C. 203, 229 F.2d 777 (1955), cert. denied, 351 U.S. 926, 76 S.Ct. 779, 100 L.Ed. 1456 (1956). In *Atchison* a railroad mail carrier sought an injunction against an experimental Post Office program permitting carriage by air of ordinary mail. The District Court recognized the experimental powers of the Department, but found the experiment unlawful if "unduly prolonged." 128 F.Supp. at 274. On appeal, this court completely upheld the Department's action. It stated that "we are unable to find any prohibition of the present experimental program, while we do find statutory provisions broad enough to encompass it within their terms." 97 U.S.App.D.C. at 208, 229 F.2d at 782. *Atchison* counsels that the Post Office's mandate to improve mail service through innovative techniques should not be frustrated by implied or niggardly restrictions upon its authority.

That principle is fully applicable here since there is no statutory prohibition on the assignment of postal employees to assist private concerns in order to ex-

14. The suit, Civil Action No. 148–70 in the United States District Court for the District of Columbia, is being held in abeyance pending the outcome of this appeal.

15. 63 Stat. 608 (1949), 39 U.S.C. §§ 847, 847a (1952).

pedite the movement of mail.[16] On the contrary, § 2203(c) (3) of Title 39 provides:

"(c) Collections from the following shall be credited by the Postmaster General to current applicable appropriations of the Department and shall be available for expenditure for the purpose of such applicable appropriations—

(3) Payments made by contractors for services performed for them by postal personnel."

This provision was enacted in 1962 (76 Stat. 109) at the request of the Post Office, which explained:

"In cases where postal personnel are used to assist contractors in order to keep the mail moving, the Department is reimbursed by the contractor for such service and such reimbursement is also placed into revenue which is not available for use by the Department to pay compensation of postal employees. It is believed that such funds should accrue to the appropriation out of which salaries are paid and made available for salaries of postal personnel." [S.Rep. No. 1538, 87 Cong., 2d Sess. 2 (1962); 1962 U. S.Code, Cong. & Adm.News, p. 1743.]

In recommending enactment of the proposal, both the House and Senate Committees stated:

"When postal employees are used to assist railroads in loading and unloading cars, the Department is reimbursed since the railroad rates include all terminal handling charges. Under this measure, such reimbursement would be credited to the appropriation out of which the salaries are paid out and thus available to pay the costs involved." [H.R.Rep. No. 858, 87th Cong., 2d Sess. 2 (1962); 1962 U.S. Code Cong. & Adm.News, pp. 1741–42; S.Rep. No. 1538, 87th Cong., 2d Sess. 2 (1962).]

We find in this provision and its legislative history ample authority for the Post Office Department's use of postal employees to remove mailgrams from the teleprinters, scan them for completeness, and insert them in envelopes.[17] Under this statute, those federal employees are authorized to do, for pay, Western Union's job of inserting the telegrams in the mails.

We conclude therefore that the Commission acted within its authority in permitting the tariff for the Mailgram experiment to become effective. Its order is

Affirmed.

---

16. Petitioner invokes § 601(b) of the Communications Act, 47 U.S.C. § 601(b) ("All duties, powers, and functions of the Postmaster General with respect to telegraph companies and telegraph lines under any existing provision of law are imposed upon and vested in the Commission.") as indicating that the Post Office was to play no part (after 1934) in the performance of the telegraph industry, but the section obviously deals only with *regulatory* powers the Postmaster General held prior to 1934.

17. For Congress to evidence its will somewhat obliquely in the postal laws is not unknown. It manifested its intent to proscribe generally the opening of first-class mail in the following way:

"Only an employee opening dead mail by authority of the Postmaster General, or a person holding a search warrant authorized by law may open any letter or parcel of the first class which is in the custody of the Department." 39 U.S.C. § 4057 (1964).

See Santana v. United States, 329 F.2d 854 (1st Cir.), cert. denied, 377 U.S. 990, 84 S.Ct. 1915, 12 L.Ed.2d 1044 (1964).